**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CARMEN H. YEDRA YHON,

                Plaintiff,

vs.                                      Case No.  3:13-cv-1607-J-JRK

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
_____/

**OPINION AND ORDER**[1]

**I.  Status**

      Carmen H. Yedra Yhon ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying her claim for supplemental security income ("SSI").  Plaintiff's alleged inability to work is due to "[f]ibrom[y]algia and bipolar disorder[,] reactive hypoglycemia[,] occa[]sional syncope[,] hypothyroidism[,] bronchial asthma[,] chronic headaches[,] [degenerative disc disease] c5-c6 w[ith] disc bul[]ge[,] cervical muscle spasm, chronic sinusitis[,] constipation[,] allergic rhinitis[,] GERD[,] [p]eripheral edema, inter[]mitt[a]n[]t[,] amenor[r]hea[,] [vitamin] b12 deficiency[, and] generalized anxiety disorder."  Transcript of Administrative Proceedings (Doc. No. 6; "Tr." or "administrative transcript"), filed April 28, 2014, at 301 (some capitalization and emphasis omitted).  On December 14, 2010, Plaintiff filed the application for SSI, alleging on onset disability date of

---

      [1]    The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  See Consent to the Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 7), filed April 28, 2014; Reference Order (Doc. No. 9), entered April 30, 2014.

December 1, 2010.  Tr. at 220-28.  Plaintiff's "[p]rotective [f]iling [d]ate" is listed in the administrative transcript as December 1, 2010.  Tr. at 296.  Plaintiff's application was denied initially, see Tr. at 124, 140-41, and was denied upon reconsideration, see Tr. at 126, 146-47.

On June 1, 2012, an Administrative Law Judge ("ALJ") held a hearing during which the ALJ heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE").  Tr. at 97-123.  At the time of the hearing, Plaintiff was forty-two (42) years old. Tr. at 102.  On August 22, 2012, the ALJ issued a Decision finding Plaintiff not disabled and denying Plaintiff's claims.  Tr. at 74-89.  Plaintiff then requested review by the Appeals Council, Tr. at 66-67, and submitted evidence to the Council in the form of a letter personally written by the Plaintiff and additional medical records dated March 20, 2012 to March 22, 2013.  Tr. at 5; see Tr. at 10-11 (letter); Tr. at 1603-1820 (medical records).  On November 29, 2013, the Appeals Council denied Plaintiff's request for review, Tr. at 1-4, thereby making the ALJ's Decision the final decision of the Commissioner.  On December 30, 2013, Plaintiff commenced this action under 42 U.S.C. § 405(g), as incorporated by § 1383(c)(3), by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

On appeal, Plaintiff contends the ALJ erred in three ways.  See Memorandum in Opposition to the Commissioner's Decision (Doc. No. 11; "Pl.'s Mem."), filed June 30, 2014 at 1-2, 11-16.  First, Plaintiff argues the ALJ "erred in finding that [] Plaintiff could perform past relevant work."  Pl.'s Mem. at 11 (emphasis and capitalization omitted); see also id. at 11-12.  Second, Plaintiff contends that the ALJ erred "in finding that [] Plaintiff had the ability to understand basic work instructions[.]"  Id. at 11 (emphasis and capitalization omitted); see

also id. at 12-13.   Third, Plaintiff contends that the ALJ erred by "rejecting the multiple opinions of Plaintiff's long[-]term treating physicians and care[]givers."  Id. at 11 (emphasis and capitalization omitted); see also id. at 13-16.   On September 29, 2014, Defendant responded by filing a Memorandum in Support of the Commissioner's Decision (Doc. No. 14; "Def.'s Mem.").  After a thorough review of the entire record and consideration of the parties' respective filings, the undersigned finds that the Commissioner's final decision is due to be reversed and remanded for further proceedings.

## II.  The ALJ's Decision

When determining whether an individual is disabled,[2] an ALJ must follow the five-step sequential inquiry set forth inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meet or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ followed the five-step sequential inquiry.  See Tr. at 76-89.  At step one, the ALJ observed that "[Plaintiff] has not engaged in substantial gainful activity since

---

[2]      "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

December 1, 2010, the application date." Tr. at 76 (emphasis and citation omitted).  At step

two, the ALJ found Plaintiff "has the following severe impairments: depression, anxiety,

fibromyalgia, degenerative joint disease, hypothyroidism, obesity, peripheral neuropathy,

status post hysterectomy and bilateral salpingo-oophorectomy, status post reconstruction

of urinary bladder, cholesysectomy, bilateral tubal ligation, hypertension, asthma, pernicious

anemia, and secondary wound infection with secondary healing, abdominal, secondary to

bilateral salpingo-oophorectomy."  Tr. at 76 (emphasis and citation omitted).  At step three,

the ALJ determined that Plaintiff "does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1."  Tr. at 76 (emphasis and citation omitted).

The ALJ determined Plaintiff has the following residual functional capacity ("RFC"):

> [Plaintiff can] perform sedentary to light work as defined in 20
> CFR [§] 416.967(a) except [Plaintiff] is limited to simple, unskilled
> work, and she can understand basic work instructions.

Tr. at 78 (emphasis omitted).  At step four, the ALJ found Plaintiff is "capable of performing

past relevant work as an assembler, production[.]"  Tr. at 87 (emphasis and citation omitted).

The ALJ made the alternative step five finding that Plaintiff's "additional limitations have little

or no effect on the occupational base of unskilled sedentary work [so a] finding of 'not

disabled' is therefore appropriate" under the Medical-Vocational Guidelines found at 20

C.F.R. Part 404, Subpart P, Appendix 2.  Tr. at 88.  The ALJ concluded that "[Plaintiff] has

not been under a disability . . . since December 1, 2010, the date the application was filed."

Tr. at 88 (emphasis and citation omitted).

### III.  Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence."  Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

### IV.  Discussion

The undersigned addresses the arguments relating to the treating medical opinions of record (the third argument) and concludes that reversal and remand is necessary for further consideration of those opinions.   Given this conclusion, and given that the

reconsideration of the evidence in light of the Court's overall findings is likely to impact the findings at which Plaintiff's remaining arguments on appeal are aimed, it is unnecessary to substantively address Plaintiff's remaining arguments.  See Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam) (declining to address certain issues because they were likely to be considered on remand); Demenech v. Sec'y of the Dep't of Health & Human Servs., 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues).[3]  A discussion follows.

## A. Relevant History

Plaintiff first became ill around February 2003, Tr. at 105, eventually developing tumors and cancer in her fallopian tubes and ovaries,  Tr. at 109.  Aixa M. Skelton, M.D. ("Dr. Skelton"), began providing general medical care to Plaintiff in April 2004, treating her for fibromyalgia, bipolar disorder, hypertension, bronchial asthma, hypothyroidism, syncope, chronic headaches, and GAD.  Tr. at 937.  According to Dr. Skelton, he saw Plaintiff "monthly" until at least May 12, 2009 when he authored an opinion regarding Plaintiff's functioning.  Tr. at 1003-06 (capitalization omitted).

Plaintiff also suffered from depression for approximately eight years prior to the June 2012 hearing before the ALJ.  Tr. at 109-10.  From January 2006 through July 2007, Plaintiff was seen by Thomas R. Wikstrom, M.D. ("Dr. Wikstrom"), a psychiatrist, for depression, Tr.

---

[3]    Although the undersigned does not deem it necessary to substantively address Plaintiff's remaining arguments, it is noted that Defendant concedes error on the part of the ALJ with respect to the step four finding that Plaintiff can return to her past relevant work.  See Def.'s Mem. at 4-6.  Defendant nevertheless argues the error is harmless.  See id.  In light of the undersigned's findings herein, if the ALJ reaches step four on remand, he should specifically reconsider his step four findings.

at 456-77, and between August 2007 and July 2008, she was seen by Alberto de la Torre, M.D. ("Dr. de la Torre"), another psychiatrist, who treated her for major depressive disorder, Tr. at 635-58.  On June 26, 2008, Plaintiff was hospitalized following a suicide attempt by drug overdose but was released three days later.  Tr. at 939-48.

Plaintiff applied for SSI in December 2010, and since then, Plaintiff has had six surgeries, including removal of her "fallopian tubes and [her] ovaries and parts of [her] uterus," as well as issues related to post-operative infections.  Tr. at 109.  Rene U. Pulido, M.D. ("Dr. Pulido"), Plaintiff's most recent general medical care provider, was treating her for abdominal pain, hypothyroidism, hypertension, fibromyalgia, depression, anemia, hair loss, shortness of breath, swelling of limbs, GERD, asthma, epilepsy, syncope, cardiac septal defect, and shoulder pain between January 2012 and March of 2012.  Tr. at 1376-1401. According to Plaintiff, the fibromyalgia caused her to experience pain throughout her body, and at the time of the June 1, 2012 hearing, she was on at least ten different types of medication and required a cane for walking.  Tr. at 111-13.  Furthermore, Plaintiff testified she was awaiting surgery for three or four levels of herniated disc in her neck, as well as a fracture of the C-5 vertebrae, Tr. at 113-14.

As discussed in more detail below, each of these treating doctors rendered opinions regarding Plaintiff's symptoms and functioning in a work environment.  Three of the four of them were discounted by the ALJ; the fourth was ignored.  As to Plaintiff's physical limitations, the ALJ relied largely on the opinion of consultative examiner Lynn Harper-Nimock, M.D. ("Dr. Nimock").  As to Plaintiff's mental limitations, the ALJ appears to have primarily relied on opinions of non-examining doctors. Relevant to the discussion of the

treating medical opinions (Dr. Skelton, Dr. Wikstrom, Dr. Dr. de la Torre, and Dr. Pulido) is a discussion of the consultative opinion of Dr. Harper-Nimock.   These opinions are summarized and addressed below.

## B. Opinions at Issue

### 1. Dr. Skelton (treating physician)

On December 19, 2006, Dr. Skelton authored an opinion on a U.S. Citizenship and Immigration Services form entitled "N-648, Medical Certification for Disability Exceptions" in which he noted that:

> [Plaintiff] suffers from bipolar disorder and generalized anxiety disorder [, which] conditions are very disabling, impairing the [Plaintiff's] ability to learn any new skills or a language - she also suffers from fibromyalgia which causes significant chronic pain and fatigue.

Tr. at 936 (capitalization omitted).  Dr. Skelton further wrote:

> [Plaintiff] suffers from significant cognitive impairment . . . .The bipolar disorder and generalized anxiety disorder cause a significant degree of memory loss and inability to learn and retain new information and skills. [Plaintiff] is unable to learn the English language or retain any knowledge of U.S. History and Civics**.**

Tr. at 936 (some capitalization omitted).

On May 12, 2009, Dr. Skelton authored another opinion on a form entitled, "§243.1 Mental Impairment Questionnaire (Listings)[.]" Tr. at 1003-07.  Dr. Skelton, who saw Plaintiff monthly, did not provide an actual mental diagnosis on the form, instead noting "deferred to patient's psychiatrist," Tr. at 1003 (capitalization omitted).  Dr. Skelton was nevertheless able to identify Plaintiff's symptoms, which included "[g]eneralized persistent anxiety"; "[s]omatization unexplained by organic disturbance"; "[b]ipolar syndrome with a history of

episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)"; "[e]motional lability"; "[e]asy distractibility"; "[m]emory impairment"; "[s]leep disturbance"; and "[a] history of multiple physical symptoms (for which there are no organic findings) of several years duration beginning before age 30, that have caused [Plaintiff] to take medicine frequently, see a physician often, and alter life patterns significantly." Tr. at 1004.

Dr. Skelton opined Plaintiff had "[m]arked . . . [r]estriction of activities of daily living"; "[m]ild . . . [d]ifficulties in maintaining social functioning"; "[m]oderate . . . [d]ifficulties in maintaining concentration, persistence, or pace"; and "[o]ne or [t]wo . . . [e]pisodes of decompensation within a 12 month period, each of at least two weeks extended duration[.]" Tr. at 1005. Additionally, Dr. Skelton opined Plaintiff had a "[m]edically documented history of a chronic organic mental . . . disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate." Tr. at 1005-06. Dr. Skelton also opined that Plaintiff's impairments or treatment would cause her to be "absent from work . . . more than four days per month", and in the comments section of the form, Dr. Skelton noted that Plaintiff had "chronic generalized pain." Tr. at 1006 (capitalization omitted).

### 2. Dr. Wikstrom (treating psychiatrist)

Before being a patient of Dr. de la Torre, Plaintiff had seen Dr. Wikstrom, another psychiatrist, on ten different occasions between January 2006 and July 2007.  Tr. at 456-77.  Although Dr. Wikstrom's notes are not entirely legible, it is clear from the notes that Dr. Wikstrom treated Plaintiff for depression, he documented a number of observations about its effects, and he offered an opinion regarding Plaintiff's ability to work.  See generally Tr. at 456-77.  On some days, Dr. Wikstrom  noted that Plaintiff seemed to be "less depressed" or "improving."  See Tr. at 457, 465-66, 468, 470-71, 473, 477.  On other days, however, Dr. Wikstrom documented that Plaintiff was indeed depressed, Tr. at 456, 458, 467, 472, and that she sometimes heard voices,  Tr. at 469.  Dr. Wikstrom opined on September 7, 2006 that "[Plaintiff] is not able to work in any capacity."  Tr. at 475-76.

### 3. Dr. de la Torre (treating psychiatrist)

On November 5, 2007, Dr. de la Torre provided an opinion on a form entitled, "§243.1 Form Mental Impairment Questionnaire (Listings)[.]" Tr. 647-50.  Dr. de la Torre saw Plaintiff monthly and diagnosed her with "major depression with psychosis." Tr. at 647.  In the clinical findings section of the form, he noted that Plaintiff was "afraid to leave her house[.]"  Tr. at 647.  Plaintiff experienced "crying, insomnia, decreased motivation, anxiety, auditory hallucinations, [and] feelings of hopelessness."  Tr. at 647.  He listed her prognosis as "[v]ery guarded."  Tr. at 647.  According  to Dr. de la Torre, Plaintiff suffered from "[a]nhedonia or pervasive loss of interest in almost all activities"; "[d]ecreased energy"; "[f]eelings of guilt or worthlessness"; "[g]eneralized persistent anxiety"; "[m]ood disturbance"; "[d]ifficulty thinking or concentrating"; "[p]sychomotor agitation or retardation"; "[p]ersistent disturbances of mood

or affect"; "[a]pprehensive expectation"; "[h]allucinations or delusions"; "[m]emory impairment"; and "[s]leep disturbance[.]"  Tr. at 648.  Dr. de la Torre opined that Plaintiff had "[m]arked . . . [r]estriction of activities of daily living"; "[m]arked . . . [d]ifficulties in maintaining social functioning"; and "[m]arked . . . difficulties in maintaining concentration, persistence, or pace[.]" Tr. at 649.  Dr. de la Torre also opined Plaintiff had a "[m]edically documented history of a chronic organic mental . . .  disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement."  Tr. at 649-50.

### 4.      Dr. Pulido (treating physician)

On February 24, 2012, Dr. Pulido authored an opinion on a form entitled, "§221.11 Form Physical Medical Source Statement[.]" Tr. at 1250-53.  Dr. Pulido noted that he had only treated Plaintiff on five visits between January 3, 2012 and February 7, 2012.  Tr. at 1250.  This statement does not appear to be accurate, however, as the records reveal that Dr. Pulido treated Plaintiff on at least eight occasions between January 2012 and March 2012.  See generally Tr. at 1376-1401. He diagnosed Plaintiff with "abdominal pain, hypothyroidism, h[yper]t[ensio]n, fibromyalgia, depression, anemia, hair loss, s[hortness ]o[f ]b[reath], swelling of [the] limb[s], GERD, asthma, epilepsy, [and] shoulder pain," Tr. at 1250, and he identified Plaintiff's symptoms as "pain, weakness, joint swelling, headaches, nausea, [and] myalgia."  Tr. at 1250.  Dr. Pulido characterized Plaintiff's fibromylagia pain as being "all over [the] body," with ranging severity, and he observed that Plaintiff has "discomfort [and]

deep palpations [and] fibromyalgia points." Tr. at 1250. Dr. Pulido opined that Plaintiff's impairments can be expected to last at least twelve months and that emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations. Tr. at 1250. Dr. Pulido further opined that Plaintiff's depression affected her physical condition; Plaintiff could only walk two to three "city blocks . . . without rest or severe pain"; Plaintiff could sit 45 minutes without getting up; Plaintiff could stand for 20 minutes before needing to sit down or walk around; Plaintiff could sit and stand/walk less than 2 hours in an 8-hour working day; Plaintiff would need a job that permits shifting positions at will from sitting, standing, or walking; Plaintiff would need to take unscheduled breaks during a working day once every hour for 15 to 30 minutes due to muscle weakness, chronic fatigue, pain/paresthesias, numbness, and the adverse effects of medication. Tr. at 1250-51.

According to Dr. Pulido, Plaintiff could rarely lift and carry 10 pounds or less than 10 pounds in a competitive work situation and could never carry 20 pounds or more. Tr. at 1252. Plaintiff could rarely twist, climb stairs, and climb ladders and could never stoop or crouch/squat. Tr. at 1252. Dr. Pulido opined that Plaintiff is incapable of even "'low stress'" work due to depression, hypertension, and fibromyalgia, and that if Plaintiff tried to work full time, she would likely need to be absent about four days per month as the result of impairment or treatment. Tr. at 1253. In the comments section of the form, Dr. Pulido wrote that Plaintiff's asthma, epilepsy, and headaches would affect her ability to work at a regular job on a sustained basis. Tr. at 1253.

On July 6, 2012, Dr Pulido indicated in a "Medical Verification Form to be Completed by Licensed Physician" that Plaintiff could not work at all due to her fibromyalgia, bipolar disorder, depression, and anxiety.  Tr. at 1602.

### 5.   Dr. Harper-Nimock (examining physician)

Dr. Harper-Nimock performed a one-time consultative examination of Plaintiff on March 21, 2011.  See Tr. at 1081-89.  On that date, Dr. Harper-Nimock noted that Plaintiff's cervical spine showed "decreased flexion, extension, lateral flexion bilaterally, and decreased rotary movement bilaterally."  Tr. at 1084.  Plaintiff's lumbar spine showed "decreased flexion in the seated position."  Tr. at 1084.  Plaintiff had "[d]ecreased [range of motion] of [the] shoulders and elbows bilaterally. . . . [and] decreased range of motion of the hips, knees, and ankles bilaterally."  Tr. at 1084.  Additionally "there was warmth and swelling of both [Plaintiff's] knees and ankles."  Tr. at 1084.  Dr. Harper-Nimock listed Plaintiff's diagnoses as fibromyalgia; degenerative joint disease; hypothyroidism; obesity; peripheral neuropathy; status post hysterectomy; bilateral salpingo-oophorectomy; reconstruction of urinary bladder; cholesysectomy; and bilateral tubal ligation; hypertension; asthma; pernicious anemia; and secondary wound infection with secondary healing in the abdomen secondary to bilateral salpingo-oophorectomy.  Tr. at 1085.  According to Dr. Harper-Nimock, Plaintiff had moderate to marked limitations for prolonged sitting, standing, walking, climbing, and heavy lifting, and mild to moderate limitations for exposure to respiratory irritants.  Tr. at 1085.  Dr. Harper-Nimock opined that Plaintiff's prognosis was poor.  Tr. at 1085.

## C. Applicable Law

The Regulations establish a "hierarchy" among legal opinions[4] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight that those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of [any] treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); see also 20 C.F.R. §§ 404.1527(e), 416.927(e).

With regard to a treating physician or psychiatrist,[5] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c). Because treating physicians or psychiatrists "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's

---

[4]     "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1513(a) (defining "[a]cceptable medical sources").

[5]     A treating physician or psychiatrist is a physician or psychiatrist who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

-14-

or psychiatrist's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's or psychiatrist's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician or psychiatrist should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's or psychiatrist's own medical records. Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted). Moreover, the opinions of non-examining physicians, taken alone, do not constitute substantial evidence. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing

Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)).  However, an ALJ may rely on a non-examining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of "any physician" whose opinion is inconsistent with the evidence. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B. 1981) (citation omitted).

An ALJ is required to consider every medical opinion.  See 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive").  While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham, 660 F.2d at 1084 (citation omitted); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); see also Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.  "'In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'"  Winschel, 631 F.3d at 1179 (quoting Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)).

## D.  Analysis

The ALJ assigned "little weight" to the opinions of treating physicians Dr. Pulido and Dr. Skelton.  Tr. at 86.  As to the treating psychiatrists, the ALJ gave "little weight" to the opinion of Dr. de la Torre, Tr. at 86, while ignoring the opinion of Dr. Wikstrom.  The ALJ assigned "more weight" to the consultative examiner Dr. Harper-Nimock.  Tr. at 86.  The ALJ's reasons for doing so were as follows:

[A]lthough [Dr. Pulido] is a treating doctor, []he only saw [Plaintiff] on five occasions, []he is not a specialist in the field of neurology and []he specifically noted that [Plaintiff] needed to have a referral for a neurologist, and [his] limitations are not supported by any objective findings but seemed to be derived primarily on [Plaintiff's] subjective complaints.  Additionally, little weight is given to Dr. P[u]lido's blanket statement indicating that [Plaintiff] could not work at all because of her depression, bipolar disorder, and anxiety, because again []he is not a specialist in this field, []he is not the [Plaintiff's] psychiatrist and she did not submit any documentation to support a finding that [Plaintiff] was disabled from her mental disorders.

The undersigned accords more weight to the consultative examiner's diagnosis and opinion given by Dr. Harper-Nimock because she based her finding on objective physical examination findings which indicated that the [Plaintiff] displayed trapezius muscle spasm in her neck, she had decreased flexion, extension, lateral flexion bilaterally and decreased rotary movement bilaterally of [Plaintiff's] cervical spine and lumbar spine, further Dr. Harper-Nimock noted that [Plaintiff] displayed having positive straight leg raises, she had decreased range of motion of her shoulders and elbows, she had decreased range of motion of her hips, knees, and ankles, and there were positive trigger points noted for fibromyalgia.  The undersigned also agrees with Dr. Harper-Nimock's medical source statement and which finds that the RFC given above adequately takes into account Dr. Harper-Nimock's medical source statement and which finds that the RFC given above adequately takes into account Dr. Harper-Nimock's general limitations for [Plaintiff].

The undersigned gives little weight to Dr. de la Torre's marked limitation of function in his submitted Mental Impairment Questionnaires because his severe restrictions regarding [Plaintiff's] mental impairment of depression are not consistent with or supported by his own treatment records which consistently showed that she had no psychotic symptoms and cognitively she appeared intact, on other mental status examination[s Plaintiff] exhibited no signs of depression, dysphoria, anxiety, suicidal ideas, psychotic symptoms, or extrapyramidal symptoms, and [Plaintiff] admitted herself that she continued to do well with her medication and Dr. de la Torre noted that [Plaintiff's] depressive disorder was much improved with a GAF score of 60.

> The undersigned gives little weight to Dr. Skelton's opinions especially about [Plaintiff's] mental impairments because he himself admitted in a Mental Impairment Questionnaire that an actual diagnosis should be deferred to her psychiatrist, which suggests he could not give an accurate opinion in this area because he is not a specialist in the field. Furthermore, Dr. Skelton's statements noting that [Plaintiff] has been diagnosed with bipolar disorder, she suffers from significant chronic pain, she has fatigue caused by her fibromyalgia, her generalized anxiety disorder is disabling and causes her to have memory loss, and she has the inability to function in any stressful situation, conflict[] with the overall, medical evidence of record which indicated that her short and long-term memory was intact, she is able to handle stress when on her psychiatric medications, her allegations of fibromyalgia are not supported by trigger points objectively over a three month period, and the available documentation of record did not establish the accepted criteria for bipolar disorder in that there was no pressure of speech noted in any of her mental status examination[s], her mood was without euphoria, mania, and there was no psychomotor retardation with depression.

Tr. at 86-87 (citations omitted).

In terms of Plaintiff's physical limitations, a review of the record reveals that the treating doctors consistently opined Plaintiff was unable to work due to chronic pain and other symptoms associated with her impairments, including fibromyalgia, but the ALJ improperly discounted them. First, Dr. Pulido, Plaintiff's most recent general practitioner, assigned a number of physical restrictions mainly based upon Plaintiff's chronic pain, fibromyalgia, and hypertension. See Tr. at 1250-53. The ALJ, in discounting Dr. Pulido's opinion, misstated the number of times that Plaintiff had seen Dr. Pulido, stating that it was five, Tr. at 86,[6] when it was really at least eight, see Tr. at 1376-1401. The ALJ then focused on the facts that Dr.

---

[6] The ALJ probably got this number from Dr. Pulido's own statement on the Physical Medical Source Statement authored on February 24, 2012. See Tr. at 1250-53.

Pulido is not a specialist in neurology, and his "limitations are not supported by any objective findings but seem to be derived primarily on [Plaintiff's] subjective complaints." Tr. at 86.

The United States Court of Appeals for the Eleventh Circuit recognized in Moore that fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly on a[n] individual's described symptoms." Moore, 405 F.3d at 1211. For this reason, a treating physician's opinion "can be particularly valuable in fibromyalgia cases, where objective evidence is often absent[.]" Id. at 1212 (citation omitted). A logical extension of this acknowledgment is that a physician asked to opine on functional limitations resulting from the fibromyalgia will base his or her opinion largely upon subjective complaints and symptoms as well. Here, the ALJ obviously accepted Dr. Pulido's diagnosis of fibromyalgia and designated it as a "severe" impairment at step two of the sequential inquiry. Tr. at 76. That diagnosis was largely based on subjective symptoms. Then, however, the ALJ refused to accept Dr. Pulido's opinion on the resulting limitations of fibromyalgia and the other impairments, reasoning in part that it "seemed" to be based on "subjective complaints." Tr. at 86. The ALJ did not observe or explain whether or how Dr. Pulido's reliance on subjective complaints in assessing the functional limitations makes the opinion (1) not bolstered by the evidence; (2) contrary to the evidence; or (3) conclusory or inconsistent with treatment notes. See Phillips, 357 F.3d at 1240-41.

So, that leaves the ALJ's stated reason that Dr. Pulido is not a specialist in neurology as the reason for discounting his opinion. Tr. at 86. It is true that Dr. Pulido is not a specialist in neurology, and it is also true that he had referred Plaintiff to a neurology specialist when he authored his first opinion. See Tr. at 1250. While specialization is a factor that may be

considered in evaluating medical opinions, see 20 C.F.R. § 404.1527(c)(5), it cannot, in and of itself, amount to good cause for discounting such opinions, see Phillips, 357 F.3d at 1240-41 (articulating the good cause reasons to discount a treating physician's opinion).[7]   In addition, not all of the diagnoses upon which Dr. Pulido's opinion was based required referral a neurology specialist.  See Tr. at 1250 (listing diagnoses).

In sum, the ALJ's stated reasons for discounting Dr. Pulido's opinion regarding Plaintiff's physical limitations are not supported by substantial evidence and/or do not amount to the required good cause.[8]

The other treating physician to opine regarding the effects of Plaintiff's physical impairments was Dr. Skelton.  The ALJ assigned "little weight" to his opinion, "especially about [Plaintiff]'s mental impairments because he himself admitted . . . that an actual diagnosis should be deferred to her psychiatrist, which suggests he could not give an accurate opinion in this area because he is not a specialist in the field."  Tr. at 86 (referring to Tr. at 1002-07.  A review of Dr. Skelton's opinion shows that when asked to provide a

---

[7]        The undersigned notes that had the ALJ articulated with the requisite specificity a good cause reason to discount Dr. Pulido's opinion, it would have been proper for the ALJ to consider this factor, along with the other factors identified in 20 C.F.R. § 404.1527(c)(2), in determining the weight to afford the opinion.

[8]        The undersigned notes that the ALJ did articulate good cause for discounting Dr. Pulido's more conclusory July 6, 2012 statement indicating that Plaintiff could not work at all because of chronic pain, depression, bipolar disorder, and anxiety, see Tr. at 1602, because as it relates to Plaintiff's mental issues, this statement was not bolstered by Dr. Pulido's notes, and Dr. Pulido did not point to any other documentation to support this statement.  While Dr. Pulido's Office Treatment Records do note that Plaintiff had symptoms consistent with depression, Tr. at 1383, these records do not support the finding that Plaintiff has a total inability to work, see generally Tr. at 1376-1401.

mental diagnosis, he deferred to the psychiatrist, Tr. at 1003, but he rendered an opinion as to Plaintiff's physical functioning that was improperly discounted by the ALJ.[9]

The ALJ concluded that Dr. Skelton's opinions regarding the effects of Plaintiff's chronic pain, fibromyalgia, and resulting fatigue "conflict[ed] with the overall, medical evidence of record . . . ." Tr. at 86.  Regarding the chronic pain and fibromyalgia, the ALJ stated that "[Plaintiff's] allegations of fibromyalgia are not supported by trigger points objectively over a three month period[.]" Tr. at 86 (referring to Tr. at 128-35).  The ALJ did not indicate the significance of objective trigger points over a three-month period.  This reason for discounting Dr. Skelton's opinion – without any elaboration – cannot stand, especially in light of Dr. Harper-Nimock's examination which revealed Plaintiff was positive for all nine fibromyalgia trigger points.  Tr. at 1089.[10]  The Shands Jacksonville records also corroborate Dr. Skelton's opinion as to Plaintiff's fibromyalgia.  See Tr. at 662-63 (documenting Plaintiff's admission to the hospital for five days due to chest pain; her final diagnoses included fibromyalgia, among other conditions).

With respect to Dr. de la Torre's opinion regarding Plaintiff's mental limitations, the ALJ articulated the following reasons for discounting it: his "severe restrictions" are not "supported by his own treatment records which consistently showed that she had no psychotic symptoms

---

[9] Despite deferring a mental diagnosis to a psychiatrist, Dr. Skelton did check a box on a form stating that Plaintiff has "signs and symptoms" of "Bipolar syndrome." Tr. at 1004.  The ALJ concluded that Dr. Skelton's observation that Plaintiff has been diagnosed with bipolar disorder was inconsistent with the evidence because symptoms of it are not established in the record.  Tr. at 86-87.  This appears to be accurate, although the undersigned notes that St. Vincent's Emergency Department Records, dated June 26, 2008, document a history of bipolar disorder.  See generally Tr. at 597-633.  According to these records, "[Plaintiff] felt aggressive, angry, was throwing things, then took extra meds (unknown) and stated [she] was trying to end her life." Tr. at 619.

[10] As stated earlier, the ALJ assigned "more weight" to Dr. Harper-Nimock's diagnosis and limitations.  Tr. at 86.

and cognitively she appeared intact," Tr. at 86 (referring to Tr. at 635), and are inconsistent with a "mental status examination" in which "[Plaintiff] exhibited no signs of depression, dysphoria, and anxiety," Tr. at 86 (referring to Tr. at 636).  The ALJ also noted that Plaintiff was doing well on her medication and her "depressive disorder was much improved with a GAF score of 60."  Tr. at 86 (referring to Tr. at 643).

In discounting Dr. de la Torre's opinion, the ALJ did not address Dr. de la Torre's treatment records collectively.  They contain significant documentation of depression, dysphoria, and anxiety.  See, e.g., Tr. at 635 (noting that Plaintiff's "affect is depressed . . . [she] is dysphoric and anxious"); Tr. at 637 (noting that "unfortunately, [Plaintiff was] depressed, with a dysphoric mood, and [was] very anxious"); Tr. at 638 (noting that Plaintiff "appeared mildly depressed with a dysphoric mood [and was] extremely preoccupied"); Tr. at 644 (noting that Plaintiff's "anxiety [had] subsided somewhat, but she [was] still feeling some of it [and Plaintiff was] also somewhat depressed and dysphoric"); Tr. at 645 (noting that Plaintiff appeared "in a moderate state of emotional discomfort, mainly characterized by a great deal of anxiety," she had "some depression and dysphoria," and she "verbalize[d] feelings of hopelessness and helplessness").  Regarding Plaintiff's response to medication, the ALJ relied on an old treatment note and did not address the most recent note, which shows that Plaintiff's major depressive disorder was "in some relapse[.]" Tr. at 635 (capitalization omitted).

Further, a review of the ALJ's Decision does not reveal any specific reference to the notes and corresponding opinion of Dr. Wikstrom, Plaintiff's treating psychiatrist from January 6, 2006 to July 10, 2007.  Tr. at 456-77.  Dr. Wikstrom treated Plaintiff for depression and

opined Plaintiff was unable to work.  On remand, the ALJ shall ensure that Dr. de la Torre and Dr. Wikstrom's opinions and notes are considered in their entirety.

### V.  Conclusion

In sum, remand is required for the ALJ to reconsider the various treating opinions. After due consideration, it is

**ORDERED:**

1.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g), as incorporated by § 1383(c)(3), **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

(A)     Reevaluate the opinions of Dr. Pulido, Dr. de la Torre, and Dr. Skelton;

(B)     Consider the notes and corresponding opinion of Dr. Wikstrom;

(C)     If appropriate, address the other issues raised by Plaintiff in this appeal; and

(D)     Take such other action as may be necessary to resolve this matter properly.

2.      The Clerk is directed to close the file.

3.      In the event benefits are awarded on remand, Plaintiff's counsel shall ensure that any § 406(b) fee application be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) and 1383(d)(2)).

**DONE AND ORDERED** at Jacksonville, Florida on March 31, 2015.


_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

efh

Copies to:

Counsel of Record